By the Court.

Lumpkin, J.
delivering the opinion.
[1.] As it respects the supposed defect in the indictment, our opinion is, that it means a free white man, and no one m-.e. Everyone, whether bond or free, who is indicted for i-.i-'-ng another in this State, is, in legal contemplation, indict< <i tot-killing a free white man. And, under this indictment, ¡.C *202 cused could not have been put upon his trial for the Mlling of a slave or free person of color. If the Mlling is within one of the exceptional cases, the indictment should so state it.
[2.] We have often, of late, had this objection as to a Juroi’, urged upon us as a ground for a now trial. And we must say, that this is the weakest case which has yet been presented. It is apparent, that the Juror made the remark attributed to him, at the moment, and for the purpose, probably, of getting off from serving on the Jury.
[8.] As this ground comes up in every application for a new trial, in a capital case, we may feel it to bo our duty, before exitertaining it at all, to require the accused to apply the tests furnished by the Act of 1848, for ascertaining the indifferency of a Juror.
By the XXXYIIIth section of the Judiciary Act of 1799, all exceptions to Jurors in civil cases, must he taken, before they are sworn. (Cobb’s Dig. 546.) The spirit of this provision would seem to require that due diligence, at least, would bo required, before a new trial would bo granted in a criminal case, on account of the disqualification of the Juror.
[4.] As to the introduction of James Dimon, whose testimony, it is contended, was not in rebxxttal, we have this to say: the witness proved facts -which went to sustain the veracity of Eardy Swinney, whose character was impeached.
[5.] Moreover, we could hardly get our consent to reverse a judgment, on the grouxxd, that the Court rendering it erred in admitting legal testimony, at any stage of the trial. Wodo not say that wre would over-rule a Judge for refusing to allow it, under all circxunstances.
[6.] The last assignment is, that the Court erred in reading to the Jury, by way of charge, fi'om the 4th division of the Penal Code ; and from the 1st to the 11th section, inclusive, off that division.
Erom what else should the Judge have read, to instruct the Jury, as to the Jaw of homicide, both as to its definitioxxs and various grades ? Neither the Acts of 1816 or 1821, or any other statute, exclusively applicable to slaves, defines murder *203 or justifiable homicide. The presiding Judge, then, must have resorted to the Common Law or the Penal Code, or left the Jury uninstructed as to their duty.
We think ho was right in looking to the Code for the Law, especially as the Act of 1850, providing for the trial of slaves, enacts, that from the finding of the' bill to the rendition of the verdict, the trial shall be governed by the Code. This includes, of course', the definition of the offence.
[7.] If there was error in tho Court at all, it was in submitting to the Jury those sections of the 4th division as to manslaughter ; an offence, which, in the opinion of this Court, cannot exist under our law, as between a slave and a freo white person, where the former is the slayer. That every such killing is . murder, or justifiable homicide. It is supposed, that where a slave is under an absolute and inexorable necessity, to take the life of a white man to- save his own, who has no right to punish him or control him in any manner whatever, that such killing will be excusable. And it may he so. For myself, I have formed no very definite opinion upon this subject. But a stern and unbending necessity forbids that any Such allowance should he made for the infirmity of temper or passion on the part of a slave, as to reduce or mitigate his crime from murder to manslaughter.